In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3148

United States of America,

Plaintiff-Appellee,

v.

Ricky Morrison,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois, Springfield Division.
No. 98 CR 30065--Jeanne E. Scott, Judge.

Argued February 11, 2000--Decided March 28, 2000

Before Posner, Chief Judge, and Manion and Kanne, Circuit Judges.

Kanne, Circuit Judge.  Ricky Morrison was convicted in district court of manufacturing methamphetamine. On appeal, he claims that the government failed to produce sufficient evidence to sustain the conviction and that the district court improperly attributed too much methamphetamine to him for purposes of establishing relevant conduct under the Sentencing Guidelines. We affirm Morrison's conviction, but we vacate the sentence imposed and remand the case to the district court for resentencing.

I.  History

On August 30, 1998, Officer Robert Power of the Quincy, Illinois, Police Department responded to a complaint of a strong odor emanating from a home. Arriving at about 11:15 p.m., Power smelled an overwhelming odor of ether coming from an exhaust fan located in an upstairs window of the home where Ricky Morrison resided. Ether is one of the many precursor chemicals used in the ephedrine reduction method of producing methamphetamine. Power, who was assigned to the anti-drug West Central Illinois Task Force and had been trained in investigating clandestine

methamphetamine laboratories, suspected that Morrison was processing methamphetamine at his home.

Power notified his supervisors of his suspicions, and they decided that he should maintain surveillance while Morrison remained in the residence. Shortly thereafter, a vehicle left Morrison's home, and Power followed. Power stopped the car and interviewed the driver, Deanna Vahle. Power found no items associated with the production of methamphetamine in Vahle's vehicle, so he let Vahle go and returned to watching the house. Later, another car left from the residence. Power also followed and stopped this car. He interviewed the driver, Heather Gilker, but found nothing associated with the production of methamphetamine in her car. Power then returned to the stake-out of Morrison's residence.

About 1:20 a.m., Power spotted Morrison's truck leaving the house. Instead of immediately following himself, Power contacted Officer Lee Mangold, and requested that Mangold make a traffic stop. Fortuitously, Morrison failed to stop at a stop sign, and Mangold attempted to stop Morrison's truck. Morrison initially refused to stop and drove an additional one and one-half blocks before pulling over. During this short police chase, police officers detected the odor of ether coming from Morrison's truck. When the truck stopped, Power, accompanied by Sergeant Glenn Schwartz, brought their squad car alongside Morrison's truck. At this point, both men saw Morrison throw a white object from his vehicle. The white object turned out to be a twist-off bottle cap, which matched a twenty- ounce Mountain Dew bottle that police found half a block away. The white twist-off cap smelled of ether, and the Mountain Dew bottle contained a liquid which field-tested positive for the presence of methamphetamine.

After performing the field test, Power searched Morrison's truck and found a large wet area on the outside of the truck, located directly beneath the driver's side window. The wet area smelled like ether, and the liquid that created the wet spot also tested positive for methamphetamine. During his search of the truck, Power also found a receipt from Home Depot Crossroads dated August 30, 1998. The receipt showed that Morrison had purchased a screw set, a plunger and a bottle of drain opener. The primary ingredient of drain opener is sulfuric acid, another precursor chemical used in the production of methamphetamine.

After obtaining a search warrant, members of

the Quincy police and the West Central Illinois Task Force, including Power, searched Morrison's residence. In the laundry room of the house, police found an empty Igloo container from which emanated the smell of anhydrous ammonia, otherwise known as liquid nitrogen, another precursor chemical. Liquid nitrogen is a crop fertilizer used in farming; it produces a noxious odor and may be toxic if inhaled. The lid to the container was found in the upstairs bathroom, the same room where the exhaust fan, from which Power had initially smelled ether, was located. In the bathroom, Power now smelled hydrogen chloride gas, which he determined arose from the sink and the bathtub. Power associated this scent with the production of methamphetamine because he knew that in the methamphetamine production process, salt and sulfuric acid are mixed to produce hydrogen chloride gas, which is used to crystallize liquid methamphetamine. The search produced no other evidence of precursor chemicals or other evidence of methamphetamine production on the premises or in Morrison's garbage.

Morrison was arrested and subsequently indicted on a single count of manufacturing a controlled substance. At trial, the government offered the eyewitness testimony of Power, Mangold and Schwartz. The government also offered the testimony of Officer Ronald Hanlin, who participated in the surveillance operation and the subsequent search of Morrison's residence, DEA Special Agent Anthony Grootens, who offered expert testimony about the methamphetamine production process, and Timothy C. Anderson, a forensic chemist who described the procedure that the government claimed Morrison used to manufacture methamphetamine. Anderson also had performed the chemical evaluation of the liquid found in the Mountain Dew bottle, and he testified that the liquid in the bottle contained 2.6 grams of methamphetamine, as well as pseudoephedrine and various other solvent compounds and by-products.

The government also proffered the testimony of two other witnesses, Tammy Kaltenbach and Michael Childress. They would have testified as to Morrison's character using evidence of other crimes under Rule 404(b) of the Federal Rules of Evidence. During the government's offer of proof, Kaltenbach admitted that her methamphetamine addiction left her in a "haze," and she was unable to remember exact dates and specific occurrences. The district court found that Kaltenbach appeared confused and lacked credibility, so it refused to allow her testimony into evidence. The district court granted permission for Childress to testify, but the government chose not to call him. The government

called no further witnesses, and the defense rested without presenting any evidence. The jury found Morrison guilty of manufacturing methamphetamine.

Although the evidence at trial concerned only the 2.6 grams of methamphetamine found in the bottle, the Presentence Investigation Report ("PSR") attributed an additional 409.35 grams of methamphetamine to Morrison on the basis of other relevant conduct. The probation office based its assessment of this relevant conduct calculation on facts obtained from interviews with seven witnesses, each of whom had engaged in at least one methamphetamine "cook" with Morrison in 1998. The original computation attributed 132 grams of methamphetamine based on the statement of Craig Schnelle, 132 grams of methamphetamine based on the statement of Harold Hills, 5.5 grams based on the statements of Kaltenbach and Kim Perkins, 69 grams of methamphetamine based on the statement of Stanley Brown and 70.85 grams of methamphetamine based on the statement of Monte Beaston. Beaston's statement also corroborated Hills's and Schnelle's statements, and the statement of Michelle Lasby also corroborated Schnelle's statement. In addition, both Kaltenbach and Adam Ransdell said they purchased methamphetamine regularly during the summer of 1998 from Morrison, but no relevant conduct was attributed to these statements for fear of double-counting.

At the sentencing hearing, the government conceded that the PSR overstated the amount of methamphetamine to be attributed on the basis of Hills's statement. Instead of 132 grams, the government only requested that the court include 85 grams in its relevant conduct calculation. To establish the reliability of the facts on which the PSR was based, the government called two witnesses, Grootens and Illinois State Police Officer Pat Frazier, a task force member. Grootens stated that he had read the interview reports on which the PSR was based and that he found the reports to be consistent with the ephedrine reduction process of manufacturing methamphetamine. Frazier testified that he conducted an interview with Schnelle, who again confirmed the information included in his statement, and Fraizer verified that the 132 grams of methamphetamine attributed as relevant conduct was a conservative estimate. Morrison presented no witnesses or evidence to contradict the evidence included in the PSR or the testimony of Grootens or Frazier.

The district court concluded that the contents of the PSR provided sufficient indicia of reliability and that the evidence established

both a relevant course of conduct and a common plan or scheme. Although the court intended to exclude the 5.5 grams of methamphetamine attributed to the testimony of Kaltenbach, it mistakenly included this amount in its final calculation of drug quantity to be attributed on the basis of relevant conduct. Therefore, the court included an additional 362.35 grams (the 409.35 grams included in the PSR less the 47 grams attributed from Hills's statement that the prosecution admitted resulted from its miscalculation) of methamphetamine as relevant conduct for the purposes of calculating Morrison's sentence, raising the total drug quantity to 364.95 grams. For 2.6 grams of methamphetamine, Morrison's total offense level under Guideline sec. 2D1.1(a)(3) would have been only 14. See United States Sentencing Guidelines sec. 2D1.1(a)(3). With the inclusion of the additional 362.35 grams of methamphetamine, Morrison's total offense level was 30. The court made no further adjustments to Morrison's total offense level and calculated his criminal history as category V, resulting in a sentence range from 151 to 188 months. The court sentenced Morrison to 180 months imprisonment, followed by a term of six years supervised release.

## II. Analysis

Morrison raises two issues on appeal. First, he claims that the government failed to present sufficient evidence to convict him. Second, he claims that the sentencing court improperly attributed too much methamphetamine to him by considering evidence of relevant conduct that lacked sufficient indicia of reliability. The government admits that the PSR erroneously included facts that resulted in double-counting for the purposes of computing Morrison's relevant conduct. It now claims that Morrison should be responsible for a total drug quantity of 294.1 grams of methamphetamine, which would result in a total offense level of twenty-eight.

## A. Sufficiency of the Evidence

Morrison argues that the jury lacked sufficient evidence to convict him on the charge of manufacturing methamphetamine. He admits that he possessed methamphetamine at the time of his arrest, but claims that the police did not uncover enough evidence during the search of his home to convince a rational jury that methamphetamine could have been manufactured there.

Morrison faces an arduous task in contending that the jury lacked sufficient evidence on which to base its conviction. On review, we ask whether

"after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Torres, 191 F.3d 799, 807 (7th Cir. 1999) (quoting United States v. Agostino, 132 F.3d 1183, 1192 (7th Cir. 1997)); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979). We will set aside a jury verdict only when "the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." Brandom v. United States, 431 F.2d 1391, 1400 (7th Cir. 1970).

Morrison cannot meet this heavy burden. Although the government's case is based largely on circumstantial evidence, "[c]rimes may be proved entirely by circumstantial evidence." United States v. Robinson, 161 F.3d 463, 471 (7th Cir. 1998) (quoting United States v. Townsend, 924 F.2d 1385, 1390 (7th Cir. 1991)). Morrison never questions that the prosecution presented evidence on all the elements of the charge; instead, Morrison argues that the cumulative evidence was insufficient to find guilt beyond a reasonable doubt. Morrison accurately notes that none of the precursor chemicals required to manufacture methamphetamine were found in his home. Nonetheless, the government produced evidence from Power which suggested that the smell of ether emanated from Morrison's home. The government also provided evidence that Morrison recently had purchased drain cleaner, in which the main ingredient was precursor chemical sulfuric acid, and that a cooler which smelled of anhydrous ammonia was found in Morrison's home. All these facts provide circumstantial evidence that Morrison possessed the necessary precursors to manufacture methamphetamine. The evidence of anhydrous ammonia is especially probative because its scent is easily recognizable (in fact, it is often deadly if inhaled) and out of place in a residence.

Morrison also notes that the government found none of the laboratory equipment required to "cook" methamphetamine in the search of his home. However, prosecution expert Grootens testified that no equipment was "required" to manufacture methamphetamine. Morrison could have manufactured methamphetamine in a bath tub if the correct precursor chemicals were used. To corroborate this theory, the government presented the testimony of Power, who stated that he smelled hydrogen chloride gas emanating from the sink and bath tub in Morrison's bathroom. This evidence, when viewed in the light most favorable to the prosecution, demonstrates that the manufacturing process could have occurred in these areas. Finally, Morrison was arrested in possession of

methamphetamine. This methamphetamine was still in its liquid, unrefined form, and in this form, methamphetamine has no recreational use or value for sale. Possession of a substance in a form that requires further "cooking" before use is highly probative to the government's contention that Morrison was in the midst of the manufacturing process when he was arrested. We find that this evidence, when viewed in the light most favorable to the prosecution, is sufficient to allow a rational jury to conclude that Morrison was engaged in the manufacture of methamphetamine in his home.

B.   Relevant Conduct

Morrison also contends that the district court erred in including an additional 362.35 grams of methamphetamine to his sentencing calculation as relevant conduct. The government concedes that 70.85 grams of this relevant conduct methamphetamine may have been added as a result of double-counting and asks for a limited remand on these grounds. Morrison claims more broadly that none of the facts on which the district court based its decision bore sufficient indicia of reliability, so all the methamphetamine added to the relevant conduct calculation should be disregarded.

We review deferentially the district court's calculation of drug quantities under the Guidelines, looking only for clear error. See United States v. Robinson, 164 F.3d 1068, 1070 (7th Cir. 1999). We acknowledge that a sentencing court may consider a wide range of information in making this calculation, provided that this information includes "sufficient indicia of reliability to support its probable accuracy." Id. (quoting United States v. Taylor, 72 F.3d 533, 543 (7th Cir. 1995)). In the instant case, however, both sides concede that the district court committed error in its calculation of relevant drug quantity. Morrison no longer contests that the evidence tendered by the government, if sufficiently reliable, would establish a relevant course of conduct or common plan or scheme. Therefore, our review of the information provided to the sentencing court must sort out which information bears sufficient indicia of reliability for inclusion into the calculation of Morrison's sentence.

The PSR used the allegations of six witnesses to include additional methamphetamine in its initial calculation of relevant conduct: Schnelle (132 grams), Hills (132 grams), Kaltenbach and Perkins (5.5 grams), Brown (69 grams) and Beaston (70.85 grams). The government has since conceded that the relevant conduct information supplied by

Beaston may duplicate some of the information supplied by Schnelle and wishes to exclude these 70.85 grams from the calculation. In addition, the prosecution admitted at sentencing that Beaston's testimony limited the amount of methamphetamine attributable from the statements of Harold Hills from 132 grams to 85 grams. Finally, although the sentencing court mistakenly included the 5.5 grams included pursuant to Tammy Kaltenbach and Kim Perkins's testimony, it found Kaltenbach unreliable as a witness. At sentencing, the court stated its intention not to include any methamphetamine added by Kaltenbach's testimony. Therefore, we must determine only whether the statements made by Schnelle, Hills and Brown are supported by sufficient indicia of reliability.

Morrison complains that Schnelle, Hills and Brown should have testified at Morrison's sentencing to demonstrate that, unlike Kaltenbach, they could coherently defend the statements attributed to them. Schnelle's, Hills's and Brown's statements were all hearsay, but hearsay evidence is admissible in the sentencing context, where the rules of evidence do not apply. See United States v. Edwards, 115 F.3d 1322, 1326 (7th Cir. 1997). As such, if the court concluded that such hearsay was reliable, it could freely include those statements within its inquiry into the relevant conduct underlying Morrison's conviction. However, in Robinson, 164 F.3d at 1070, we noted that in circumstances where evidence of relevant conduct significantly increased drug calculations, statements of a defendant's associates might require further testimony as substantial indicia of reliability.

In Robinson, evidence of relevant conduct was based on information taken from state police investigative reports, and this evidence accounted for 97 percent of the total quantity of drugs attributed to the defendant. None of the individuals who made the statements on which the relevant conduct calculation was based testified at trial or at sentencing. Moreover, the majority of the increase was based on the uncorroborated testimony of one witness, whose statements made "no sense at all" and failed to establish the indicia of reliability on which the sentencing court must have relied. For this reason, we vacated Robinson's sentence and remanded for resentencing. See id. at 1071. The facts of the instant case share many similarities with those of Robinson, but they also demonstrate notable differences.

In the case before us, the prosecution seems to have adopted the same approach that troubled us in Robinson. The prosecution obtained a

conviction based on the relatively small quantity of methamphetamine that was found when the defendant was stopped. At sentencing, the prosecution sought to enhance substantially the defendant's sentence by using statements of his confederates to establish a pattern of behavior involving many other instances of drug manufacture. We have noted our concern with the potential abuse of "relevant conduct" aggregation on numerous instances. See, e.g., United States v. Bacallao, 149 F.3d 717, 721 (7th Cir. 1998); United States v. Duarte, 950 F.2d 1255, 1263 (7th Cir. 1991); United States v. Ebbole, 917 F.2d 1495, 1501-02 (7th Cir. 1990); United States v. Fischer, 905 F.2d 140, 141 (7th Cir. 1990). However, we necessarily upheld the sentence when there was evidence of a relevant course of conduct because the district court is able to draw upon a wide range of perceptions in verifying those activities that were part of the same course of conduct. We will not allow the disparity between conduct disclosed at sentencing to enhance a defendant's sentence to the degree that the sentencing hearing becomes a "tail which wags the dog of the substantive offense." United States v. Corbin, 998 F.2d 1377, 1387 (7th Cir. 1993). Here, as in Robinson, the relevant conduct attributed to Morrison increased his drug quantity calculation more than 100 fold.

In Robinson, we concluded that "it's not a terribly bad idea" for individuals to testify solely because of the effect their statements had on the sentencing calculation. At trial, the prosecution attempted to call one of the witnesses eventually used to establish relevant conduct in the PSR, Kaltenbach, but the district court found that her methamphetamine abuse had so clouded her memory as to make her unreliable as a witness and refused to allow her testimony. Morrison contends that the court erred by not requiring testimony of the individuals whose statements formed the basis of the PSR, because the court had no basis to assess whether these other witnesses were credible. Although this court has held that district courts should carefully scrutinize the statements of drug addicts, see United States v. Beler, 20 F.3d 1428, 1435 (7th Cir. 1994), we do not believe that witness testimony was required to perform such scrutiny.

In Robinson, we found that the evidence lacked sufficient indicia of reliability because the statements of the individual who attributed the lion's share of the relevant conduct drug quantity to the defendant made statements that were uncorroborated and patently unreliable. In this case, the statements made by Schnelle, Brown and Hills were not inconsistent and did not

contradict one another. The prosecution presented Grootens to testify that the statements made by these witnesses were internally consistent and credible. According to Grootens, the statements made by Schnelle, Brown and Hills demonstrated that Morrison frequently manufactured methamphetamine, and that, when he did so, his technique appeared to be consistent with the ephedrine production manufacture of methamphetamine. Schnelle, Hills and Brown all described Morrison to have manufactured methamphetamine in a uniform manner on multiple occasions, and the similarity in their statements reinforced the credibility of each individual statement. Moreover, because each statement refers to manufacture at a different location, there is no longer reason to fear further double-counting.

In addition, the testimony of Schnelle and Hills is corroborated by other statements included in the PSR. The corroboration of other witnesses, even if the corroborating witnesses are of unproven credibility, may imbue their statements with sufficient indicia of reliability. See United States v. Taylor, 72 F.3d 533, 543 (7th Cir. 1995). The prosecution called Frazier, who had conducted an interview with Schnelle, and Frazier testified that Schnelle confirmed his statement at the interview. Schnelle's statement is corroborated further by the statements made by Beaston and Lasby. Although the prosecution presented no witnesses to confirm that Hills was mentally sound when he gave his statement, Beaston's statement also corroborates Hills's statement. Brown's statement is not corroborated by other statements given. Nonetheless, his statement is internally consistent and depicts a course of conduct congruent to the course of conduct depicted in the other statements. Because the statements given by Schnelle, Hills and Brown were apparently credible and because Schnelle's and Hills's statements were corroborated by the statements of other witnesses, we find no clear error in the inclusion of drug quantities alleged by these witnesses in the calculation of Morrison's relevant conduct.

Therefore, even though Schnelle, Hills and Brown did not testify, the district court possessed sufficiently reliable evidence to attribute an additional 286 grams of methamphetamine (Schnelle's 132 grams, Hills's 85 grams and Brown's 69 grams) to the calculation of drug quantity to attribute to Morrison, which raises the total drug quantity attributable to Morrison to 288.6 grams. Accordingly, Morrison's total offense level, according to U.S.S.G. sec. 2D1.1(a)(3), should drop from 30 to 28, and his

sentence range would drop from 151 to 188 months to 130 to 162 months. We vacate Morrison's sentence of 180 months and remand to the district court for resentencing.

III.  Conclusion

The government presented sufficient evidence to allow a jury to find Morrison guilty beyond a reasonable doubt. However, the district court committed clear error in its calculation of drug quantities attributable to Morrison's relevant conduct. Therefore, we vacate Morrison's sentence and remand for resentencing.